

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 7, 2023**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ROBERSON CARTRIDGE CO., LLC, | § | CASE NO. 22-20192-rlj7 |
| | § | |
| Debtor. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court issues its findings of fact and conclusions of law in this case. Trial was held January 12, January 17, and January 23, 2023. Upon conclusion of the trial, the matter was taken under advisement. The Court's findings and conclusions are based upon the record before the Court and are issued under Rule 52 of the Federal Rules of Civil Procedure, made applicable in this bankruptcy case by Rules 9014 and 7052 of the Federal Rules of Bankruptcy Procedure.

### I. FINDINGS OF FACT

1.      Roberson Cartridge Co., LLC (Roberson Cartridge) is a Texas limited liability company. Matador Brass Ex. 1G at 2. It is a relatively new company that, prior to filing its chapter 7 petition, manufactured cartridges for ammunition. Jeff Roberson supplied Roberson Cartridge's initial capital and received Class A Units as an interest in Roberson Cartridge. *Id.* at 15, 61. The Amended and Restated Company Agreement lists Trey Barrientos as a member of

1

Roberson Cartridge. Matador Brass Ex. 1G. But Roberson Cartridge and Matador Brass Partners, LLC refer to Roberson as the "100% owner" of Roberson Cartridge. *See* ECF No. 22 ¶ 2 (In its motion, Matador Brass stated "[Roberson Cartridge's] sole member is Jeff Roberson."); ECF No. 33 at 2 (Roberson Cartridge's response stated that "Jeff Roberson [is] the 100% owner, and president and manager of [Roberson Cartridge]").[1] Even if Trey Barrientos holds 6,000 Class A Units, Roberson has 94,000 Class A Units and remains the sole manager of Roberson Cartridge. *See* Matador Brass Ex. 1G at 61.

2.      John Greer is president and manager of Matador Brass Partners, LLC (Matador Brass), which was created for the sole purpose to provide financing to Roberson Cartridge. Matador Brass was created and owned by Matador Capital Partners, LLC, of which Greer is managing partner. Greer described Matador Capital Partners as a private equity and finance company that invests in manufacturing, software, real estate, and intellectual property ventures— businesses that he described as "rubber-meets-the-road" businesses.

3.      The parties agreed that Matador Brass would provide between $1,000,000 and $10,000,000 to Roberson Cartridge. Matador Brass Ex. 1A at 10. The loan documents provide that the loan is a convertible loan. *Id*. at 16.

> Lender shall have the right, at its option, to convert the outstanding principal amount of the Convertible Loans and any accrued interest, in whole or in part, into such number of Class B Units as is determined by dividing (A) the amount of the principal and accrued interest of any Convertible Loans being converted by (B) $10,000.00.

*Id*. at 16. Matador Brass has not converted any amount of its loans into Class B Units. As collateral, Roberson personally pledged his Class A Units. Matador Brass Exs. 1D–1F. Matador Brass has not foreclosed on Roberson's Class A Units. The Membership Interest Pledge

---

[1] "ECF No." refers to the numbered docket entry in Case No. 22-20192.

Agreement states that, in the event of default, Roberson's voting rights immediately cease, and those voting rights vest in Matador Brass.  Matador Brass Ex. 1E at 7.

4.      As required by the loan agreement, Roberson Cartridge executed an Amended and Restated Company Agreement (Amended Company Agreement).  Matador Brass Ex. 1G.  The Amended Company Agreement states that "[u]ntil Matador's acquisition of Class B Units, Matador shall not be a Member of the Company but shall be a third-party beneficiary of this Agreement with a right to enforce the provisions of this Agreement applicable to Matador."  *Id*. at 15.  The Amended Company Agreement also requires that Roberson Cartridge obtain Matador Brass's written consent before it can take "any action that results in a liquidation or dissolution of the Company[.]"  *Id*. at 20.

5.      Roberson Cartridge later defaulted on its payments to Matador Brass.

6.      Of Matador Brass's $10 million credit line, it advanced about $4.4 million from May 2021 to September 2022.  ECF No. 49 ¶ 22.  It filed a proof of claim reflecting a balance of $4,472,313.67, with an unsecured balance of $3,346,798.67.  Claim No. 36-1.[2]

7.      Without Matador Brass's consent, Roberson, in his capacity as manager of Roberson Cartridge, entered a resolution to allow Roberson Cartridge to file a bankruptcy petition.  Debtor Ex. 1.  That same day, October 18, 2022, Roberson Cartridge filed its chapter 7 petition.  ECF No. 1.

8.      On November 3, 2022, Matador Brass filed a motion to convert the case from chapter 7 to chapter 11 (and specifically to subchapter V of chapter 11) or, alternatively, to dismiss the case.  ECF Nos. 22, 24.  Matador Brass argues the case should be dismissed because Roberson Cartridge filed its petition without proper authority.  It contends that Roberson

---

[2] "Claim No." refers to a proof of claim filed in the Court's numbered claims register in Case No. 22-20192.

Cartridge acted without authority because (1) Roberson was stripped of his member voting rights immediately upon Roberson Cartridge's default, and (2) Roberson Cartridge's Amended Company Agreement required it to receive Matador Brass's approval before taking actions to liquidate the company and it did not receive such approval prior to filing its petition. But Matador Brass's preferred position is to convert the case from chapter 7 to chapter 11 subchapter V on the grounds that a reorganization would bring the greatest benefit to the parties. And while Matador Brass prefers a conversion, at a hearing on the issue, Matador Brass conceded that if the debtor lacked authority to file the bankruptcy petition, then the case must be dismissed. Roberson Cartridge and the chapter 7 trustee, Kent Ries (Trustee), oppose the motion.

9.    The debtor's schedules reflect personal property assets of over $11,000,000. But the value is based, in part, on an estimated value of $5,000,000 in a "patent pending" and a potential cause of action against Matador Brass of $4,300,000 for breach of contract, fraud, and violations of the Deceptive Trade Practices Act. Such amounts are speculative at best. (The debtor also claimed a value of $5,000,000 for the commercial building and lot.)

10.    The schedules, as amended, reflect secured claims against the debtor of $5,654,835.00 and unsecured claims of $2,895,761.84. The unsecured amount, however, includes a claim of Bliss Munitions Equipment of over $2.6 million. Bliss has not filed a claim in the case.[3] The unsecured claims also include almost 500 claims by "customers,"[4] many of which paid deposits upon orders made. Such claims are relatively small—ranging from

---

[3] The deadline for filing proofs of claim expired on February 15, 2023, while this matter was under advisement.
[4] Schedule E/F lists nearly 500 individuals as nonpriority, unsecured creditors; it does not define the relationship between the debtor and the individuals. And as the basis for these claims, the schedule says only "Unsecured."

approximately $200 to $600 each[5]—but are possible priority claims under § 507(a)(7) of the Bankruptcy Code.[6]

11.     The one asset in the case with significant equity is the 40,000-square-foot commercial building where the cartridges were manufactured.  The manufacturing process took place in a 5,000-square-foot room within the building.  The building sits on an approximate twenty-three-acre tract.  The Trustee solicited bids for purchase of the building and real estate in anticipation of an auction sale among the bidders; the bids have approached or exceeded $1.8 million.  Amarillo National Bank asserts a deed of trust lien against the property that secures a debt of about $1.3 million.  The Court issued its order on January 13, 2023 staying the Trustee's sale of the property pending resolution of the motion to convert or dismiss.

12.     Roberson Cartridge operated at a loss.  Roberson testified that the business lost money from May 2021 to September 2022—the period of time that Matador extended credit to Roberson Cartridge.  Greer testified that Roberson Cartridge never made a profit.

13.     As stated, the debtor listed that its patent rights have a value of $5,000,000 and that it has a claim against Matador Brass that it values at $4,300,000.  The Court is skeptical of these values.  The debtor's schedules also list the building and land as having a value of $5,000,000, which is almost triple the value of any bids on the property.  But the Court does not here assess the validity of the patent or the causes of action.  Matador Brass, through Greer's testimony, disputes any value to either "asset."  But Greer's testimony regarding the "patent pending" was misleading or, perhaps, confused.  And when challenged, he tried, unsuccessfully, to explain away his testimony.  For the causes of action, the evidence reflects that there is a dispute between Greer and Roberson concerning Matador Brass's loan funding and how that

---

[5] While the vast majority of these debts are in the range of $200 to $600, some exceed $1,000.
[6] "Section" or "§" refers to 11 U.S.C., the Bankruptcy Code, unless otherwise stated.

impacted the business.  Matador Brass's plan for conversion contemplates using the building for

a new, proposed business.

14.     At the time this case was filed, Matador Brass was, and still is, a creditor only.

There is no evidence that it has taken steps to foreclose its security interest in Roberson's

membership interest in Roberson Cartridge.

15.     Matador Brass provided a proposed plan for the case in the event of conversion to

chapter 11.  Matador Brass Ex. 3.  The plan is premised upon obtaining confirmation under

subchapter V of chapter 11.  *Id*. at 5, 10.  As described in Greer's testimony, the plan boils down

to selling personal property that secures its debt, consisting of Roberson Cartridge's inventory, a

trailer, and several machines.[7]  The proceeds would pay creditors and purchase a cheaper

machine for the mass production of projectiles.  During the reorganization, Roberson Cartridge

would begin making projectiles to sell to ammunition manufacturers.  It would cure payment

defaults to secured creditors and maintain payments going forward.  The plan projects paying all

creditors and successfully reorganizing the business into a profitable and sustainable enterprise.

The plan also includes a general release of all claims the debtor, members of the debtor, and

objecting shareholders may hold against each other.  *Id*. at 5.  During his testimony, Greer

emphasized that Roberson Cartridge will retain its realty.  Retaining the building, according to

Greer, is necessary for the manufacturing business and allows Matador Brass to recoup the

benefit of funds it advanced for improvements to the building.

16.     The plan includes a liquidation analysis showing that unsecured claimholders

would receive an 8% dividend in a chapter 7.  Matador Brass Ex. 2.  The crux of Matador

Brass's argument is that under its chapter 11 plan all creditors would be paid in full; in addition,

---

[7] From Greer's testimony, the plan presumes Matador Brass or Greer will essentially run the debtor—although the
mechanics of the relationship are unclear.

Matador Brass would be paying other creditors out of its collateral and thus it alone assumes the risk of recovery from the new business's operations.

17.     Matador Brass's plan does not provide for the capital that would be needed for a stretched-out, regular chapter 11 case.  And there is no evidence the debtor has sufficient funds for a chapter 11 case.

18.     While Matador Brass correctly argues that the purpose of chapter 11 is "to preserve going concern value and to rehabilitate [the debtor's] financial condition," it is proposing a plan for the production of a different product—projectiles—using different materials and different equipment.  The proposed business would also have new customers and new end-users.  It is a new, start-up business that retains and uses the debtor's facility, which is much larger than what was needed for the debtor's business and will be as well for Matador Brass's proposed business.

## II.  CONCLUSIONS OF LAW

1.     The Court has jurisdiction of this case and this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and the Northern District of Texas's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc, Misc. Order 33.  This matter is a core proceeding.  28 U.S.C. § 157(b)(2)(A), (O).

2.     Matador Brass prefers conversion of this case to chapter 11, and specifically to subchapter V of chapter 11.  But it also seeks, in the alternative, that the case be dismissed.  Its basis for dismissal is that Roberson Cartridge filed without proper authority.  If the case was filed without proper authority, the Court must dismiss the case.  The Court thus first addresses dismissal of the case.

## A.  Dismissal

3.      Corporations can file voluntary bankruptcy petitions only if the agents acting on

their behalf have the proper authority.  *Franchise Servs. of N. Am. v. U.S. Tr. (In re Franchise*

*Servs. of N. Am., Inc.)*, 891 F.3d 198, 206 (5th Cir. 2018).  When a petition is filed by a

corporation's agents and the agents lack authority, the case must be dismissed*.  Price v. Gurney*,

324 U.S. 100, 106, 65 S. Ct. 513, 516 (1945).  The issue of authority is determined by state law.

*Franchise Servs. of N. Am.*, 891 F.3d at 206.

4.      Matador Brass argues three points for dismissal: (1) Roberson, the presumptive

sole member of Roberson Cartridge, "was stripped of his rights to vote the interests to authorize

the filing of a bankruptcy petition,"[8] and the resolution he signed authorizing the filing was

improper and ineffective, (2) under the Amended Company Agreement, Roberson Cartridge

needed but did not obtain the permission of Matador Brass before filing its chapter 7 petition,

thereby rendering the filing ineffective, and (3) Roberson Cartridge filed the case in bad faith.

### Voting rights

5.      Matador Brass argues that, upon Roberson Cartridge's default, Roberson's voting

rights vested in Matador Brass and, as a result, he lost any right to issue a board resolution

enabling Roberson Cartridge's chapter 7 filing.

6.      Matador Brass cites *In re Texas Rangers Baseball Partners*, 434 B.R. 393 (Bankr.

N.D. Tex. 2010) (Lynn, J.), to support the proposition that voting rights are stripped when those

rights are pledged pursuant to a loan agreement and the debtor defaults.  Judge Lynn did not

expressly state whether the voting rights of the debtor were immediately divested; rather, there

he found that the lender acquiesced to the debtor's continued control.  *Id*. at 404.  The debtor

---

[8] ECF No. 49 ¶ 49.

continued to control the company after default, while the lender did not object to the control. *Id*. But "[m]ost tellingly, … [the lender] commenced involuntary chapter 11 cases against [the debtors]." *Id*. In that case, the lenders did not dispute the debtor's authority to file; however, Judge Lynn did indicate that a pledge of voting rights may strip the pledgor upon default of the underlying loan.

7.    Matador Brass concedes that Texas Business Organizations Code § 101.108[9] may prevent it from managing the company; however, it argues that Roberson's voting rights were relinquished immediately upon default so he lacked authority to file Roberson Cartridge's petition. The question at first blush is whether Roberson lost all voting rights immediately upon default. But the controlling issue is whether Roberson, as sole manager, had authority to execute a board resolution authorizing Roberson Cartridge to file a bankruptcy petition.

8.    The Court has noted that

> [M]embership units in an LLC may be assigned, but the assignment does not entitle the assignee to participate in management, to become a member, or to exercise the rights of a member. *See* Tex. Bus. Orgs. Code Ann. § 101.108 (West 2014). The assignee is entitled to an allocation of the economic attributes—income, gain, loss, distributions, etc.—but only to the extent that such benefits have been assigned. *Id*. § 101.109. An assignee may become a member on approval of all members. *Id*.

*In re Wilson*, No. 11-50396, 2014 WL 3700634, at *6 (Bankr. N.D. Tex. July 24, 2014).

9.    Turning to the Amended Company Agreement, "no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company." Matador Brass Ex. 1G at 22. The members within Roberson Cartridge "have the right to attend meetings of the Members and speak at such meetings. An annual meeting of Members to elect the

---

[9] Section 101.108 of the Texas Business Organizations Code states: "An assignment of a membership interest in a limited liability company: … does not entitle the assignee to: (A) participate in the management and affairs of the company; (B) become a member of the company; or (C) exercise any rights of a member of the company." Tex. Bus. Orgs. Code Ann. § 101.108(b)(2).

9

Managers and transact such other business as is brought before the meeting may be held as determined by the Managers." *Id*. Accordingly, the voting rights of members are limited to electing managers and voting on other matters brought by the managers.[10]

10. Under Texas Business Organizations Code § 101.251, "[t]he governing authority of a limited liability company consists of: … the managers of the company, if the company agreement provides that the company is managed by one or more managers[.]" Per the Amended Company Agreement, the board of managers manages, operates, and controls the business and affairs of the company. Matador Brass Ex. 1G at 28. Roberson Cartridge's managers have the authority to act on behalf of the company pursuant to a board resolution. *Id*. As confirmed by Greer's testimony, Roberson was the sole manager at the time the bankruptcy was filed. In Roberson's capacity as sole manager of Roberson Cartridge, the board entered a resolution to authorize the filing of Roberson Cartridge's chapter 7 petition. Debtor Ex. 1.

11. Roberson did not use his voting rights as a member to authorize the filing of the bankruptcy petition, so even if his member voting rights were immediately divested, his authority as sole manager was unaffected. The board resolution thereby effectively authorized Roberson Cartridge to file its petition. This conclusion is also supported by the Texas Business Organizations Code. Section 101.356 requires the affirmative vote of a majority of all members for an LLC to act outside the ordinary course of business; however, section 101.552 states that "[a] majority vote of all of the members of a limited liability company or, if the limited liability company has no members, a majority of all of the managers of the company is required to

---

[10] But note, the Winding Up and Termination clause of the Amended Company Agreement states that "[t]he Company shall wind up its business and affairs only upon the occurrence of any of the following events: (a) An election to dissolve the Company made by holders of a majority of the Class A Units and a majority of the Class B Units; (b) The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company[.]" Matador Brass Ex. 1G at 47. The members also have the authority to vote and wind-up the company. Likewise, the language indicates managers can also trigger the wind-up on termination by selling, disposing of, or transferring all or substantially all of Roberson Cartridge's assets.

approve (1) a voluntary winding up of the company[.]"  There is conflicting evidence on whether

another member exists, but, in their briefing, both parties state that Roberson is the sole owner.

If Roberson was the sole member, and if he lost his membership interest upon default, then no

member existed to vote.  Under § 101.552, the manager had authority to approve the winding-up

of the business.

### The blocking provision

12.     Next, Matador Brass argues that Roberson Cartridge did not properly file its

petition because its Amended Company Agreement required Matador Brass's approval before it

filed its petition and Roberson Cartridge never received such approval.

13.     Texas law states that "[t]he governing authority of a limited liability company

shall manage the business and affairs of the company as provided by: (1) the company

agreement[.]"  Tex. Bus. Orgs. Code § 101.252.  The Amended Company Agreement requires

that Roberson Cartridge obtain Matador Brass's written consent before it takes "any action that

results in a liquidation or dissolution of the Company[.]"  Matador Brass Ex. 1G at 20.  The issue

is whether this provision of the Amended Company Agreement limited or blocked the debtor's

ability to file a chapter 7 petition.

14.     The provision is a form of a blocking provision.  *See Franchise Servs. of N. Am.*,

891 F.3d at 205 ("Courts appear to use the term 'blocking provision' as a catch-all to refer to

various contractual provisions through which a creditor reserves a right to prevent a debtor from

filing for bankruptcy."); *see generally* 1 COLLIER LENDING INSTITUTIONS & BANKRUPTCY CODE

¶ 2.09 (2022).  "In general, the enforceability of blocking provisions depends on who has them.

If it is creditors, they are generally *unenforceable*. If it is equity interest holders, they are

generally *enforceable*."  1 COLLIER LENDING INSTITUTIONS & BANKRUPTCY CODE ¶ 2.09[3]

(2022) (emphasis added).  *Compare In re Orchard at Hansen Park, LLC*, 347 B.R. 822 (Bankr.

N.D. Tex. 2006) (A chapter 11 case was dismissed because the LLC's operating agreement

required the consent of all members for the LLC to file for bankruptcy relief, and the

petitioner—holding a 90% interest in the LLC—did not receive consent from the other member

who held the remaining 10% interest.), *with In re Lake Mich. Beach Pottawattamie Resort LLC*,

547 B.R. 899 (Bankr. N.D. Ill. 2016) (A debtor LLC amended its operating agreement, wherein

it granted a creditor the right to approve or disapprove of filing bankruptcy petitions. There, the

court held the provision was void as against public policy.).

15.    The Fifth Circuit has not directly addressed the issue of pre-petition waivers of

the right to file bankruptcy.  *See Franchise Servs. of N. Am.*, 891 F.3d at 207 ("Several courts of

appeals—though not this one—have opined that a pre-petition waiver of the benefits of

bankruptcy is contrary to federal law and therefore void … . As this case is framed, we can

assume without deciding that such a waiver is invalid. We leave the resolution of that issue for

another case, one in which it is squarely presented.").

16.    In *Franchise Services of North America*, the Fifth Circuit held "[f]ederal law does

not prevent a *bona fide shareholder* from exercising its right to vote against a bankruptcy

petition just because it is also an unsecured creditor."  891 F.3d at 203 (emphasis added).  The

court acknowledged its holding was limited:

> As we note later in this opinion, our holding goes no further. This case involves a
> bona fide shareholder. The equity investment made by the shareholder at issue here
> was $15 million and the debt just $3 million. We are not confronted with a case
> where a creditor has somehow contracted for the right to prevent a bankruptcy or
> where the equity interest is just a ruse.

*Franchise Servs. of N. Am.*, 891 F.3d at 203 n.1.

17.     Unlike *Franchise Services of North America*, the Court is presented with a case where a creditor holds a convertible loan, not yet converted into a membership interest, and the creditor conditioned the debtor's ability to file bankruptcy on the creditor's approval.

18.     Courts have found blocking provisions are void on public policy grounds when a creditor, without an ownership interest, retains the ability to block the filing of a petition.  *See In re Lake Mich. Beach Pottawattamie Resort LLC*, 547 B.R. 899 (Bankr. N.D. Ill. 2016) (Amendments to an LLC's operating agreement that required a creditor's approval before the LLC could file bankruptcy was void as against public policy).  A court has gone so far as to hold that public policy voids blocking provisions even when the creditor has an ownership interest but the ownership interest is nominal.  *In re Intervention Energy Holdings*, LLC, 553 B.R. 258 (Bankr. D. Del. 2016) (The operating agreement was amended to include the creditor as the holder of one common unit and required approval of all members holding common units to approve before filing a voluntary bankruptcy petition.  The court held the agreement was void as against public policy because the nature and substance of the agreement was to contract away the LLC's right to a discharge in bankruptcy.).

19.     "It is a well settled principal [*sic*] that an advance agreement to waive the benefits conferred by the bankruptcy laws is wholly void as against public policy."  *In re Tru Block Concrete Prods., Inc.*, 27 B.R. 486, 492 (Bankr. S.D. Cal. 1983).  "[S]ince bankruptcy is designed to produce a system of reorganization and distribution different from what [one] would obtain under nonbankruptcy law, it would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply."  *Bank of Am. v. N. LaSalle St. Ltd. P'ship (In re 203 N. Lasalle St. P'ship.)*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000). "This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would

routinely require their debtors to waive." *Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir. 2002).

20.     The Amended Company Agreement required that Roberson Cartridge obtain Matador Brass's approval before taking action to liquidate the company.

21.     The Amended Company Agreement and loan documents were entered on May 14, 2021.  Matador Brass Ex. 1G, 1A.  Matador Brass has not converted its interest as a creditor to that of a member.  Matador Brass entered a relationship with Roberson Cartridge as a creditor and remains a creditor.  Requiring a borrower to waive its right to file a bankruptcy petition, as Matador Brass required of Roberson Cartridge, is void as against public policy.  There is no precedent for upholding a blocking provision when the blocking creditor holds no ownership interest in the debtor.

22.     Matador Brass has no ownership interest in Roberson Cartridge; the blocking provision of the Amended Company Agreement is void.  Roberson Cartridge complied with the Amended Company Agreement and governing Texas law when it filed its bankruptcy petition.  Roberson Cartridge filed its petition with proper authority; the Court denies Matador Brass's motion to dismiss.

**Bad faith**

23.     Related to its argument that Roberson lacked authority to authorize the bankruptcy filing, Matador Brass, by its motion, submits that the case was filed in bad faith and should be dismissed under § 707(a) of the Bankruptcy Code.

24.     Section 707(a) provides that a chapter 7 case may be dismissed "for cause," including unreasonable delay, nonpayment of fees or charges, and failure to timely file

schedules.  The specific bases for dismissal do not apply here.  And the Court has concluded that the filing was properly authorized.

25.     Matador Brass makes another argument for its bad faith charge.  It says "that the filing should not be utilized to seek a 'fresh start' for the Debtor in the sense contemplated in Chapter 7 for 'honest but unfortunate' debtors … who are seeking the protection of the Bankruptcy Code in good faith."  This point is not supported by the evidence.  A corporate entity does not receive a discharge in chapter 7, *see* § 727(a)(1), but it is certainly allowed to file for liquidation.  The reason for filing is obvious.  Roberson Cartridge was experiencing mounting losses; it had no liquidity, financing, or capital; it had defaulted on payments to secured creditors; and its customer base was limited.  Chapter 11 was not a viable option.  Its filing was not in bad faith.

**B.  Conversion to Subchapter V of Chapter 11**

26.     Matador Brass asks the Court to convert Roberson Cartridge's chapter 7 case to a case under subchapter V of chapter 11 of the Bankruptcy Code.[11]  ECF No. 22.  Roberson Cartridge and the Trustee oppose the motion to convert.

27.     Section 706(b) permits the court to convert a case from chapter 7 to chapter 11 upon "request of a party in interest and after notice and a hearing."  "[D]ecisions to convert are within the discretionary powers of the bankruptcy court based on the court's determination of what will most inure to the benefit of all parties in interest."  *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1161 (5th Cir. 1988).

28.     The subchapter V provisions of chapter 11, §§ 1181–1195, provide for a far simpler, faster, less-costly process than regular chapter 11.  Subchapter V eliminates the absolute

---

[11] "Subchapter V" refers to a case under 11 U.S.C. §§ 1181–1195.

priority rule—which is a substantive requirement of chapter 11 that can make confirmation difficult, if not impossible, if present ownership wishes to retain its interest in the company. § 1181(a) (making § 1129(b) inapplicable to subchapter V cases).  Subchapter V also allows a debtor to obtain confirmation without *any* classes of creditors voting in favor of the company's proposed plan.  § 1191(b).  But the problem here is that only the debtor can propose a plan under subchapter V.

29.     The Court cannot, as Matador Brass requests, convert a chapter 7 case directly to a subchapter V case under chapter 11.

> A small business debtor or a debtor as defined in section 1182(1) may also be the subject of an involuntary chapter 11 petition under section 303, *but subchapter V is a voluntary subchapter, and the election to proceed under subchapter V can be made only by the small business debtor or a debtor as defined in section 1182(1).* In an involuntary chapter 11 case, under Interim Rule 1020(a) of the Federal Rules of Bankruptcy Procedure, the small business debtor or debtor as defined in section 1182(1) has 14 days from the date of the entry of the order for relief to file a statement that the debtor is a small business debtor or a debtor as defined in section 1182(1) and, if the latter, whether it elects to proceed under subchapter V. Because subchapter V will proceed on a fast track, a debtor may not want to wait 14 days to make an election.

8 COLLIER ON BANKRUPTCY ¶ 1180.03 (16th 2022) (emphasis added).  No rule allows conversion from a chapter 7 to a subchapter V case without the debtor's consent; in fact, Rule 1020(a) of the Federal Rules of Bankruptcy Procedure requires that the debtor, in an *involuntary* chapter 11 case, make the election to proceed under subchapter V.  Here, Matador Brass seeks to convert the chapter 7 case directly to a subchapter V case over Roberson Cartridge's objection.

30.     The Bankruptcy Code provides that the election to proceed as a subchapter V case is exclusively the debtor's decision.  The Court finds no authority that authorizes it to foist such decision onto the debtor.

31.     Matador Brass's plan is for subchapter V.  Matador Brass Ex. 3 at 5, 10.  The
Court will not consider Matador Brass's proposal under regular chapter 11—it is not what is
requested, and it is not for the Court to discern if regular chapter 11 is a feasible alternative.
Besides, the evidence of the status of the debtor and of Matador Brass at the time this case was
filed and through this proceeding—as debtor and creditor, respectively—provides no explanation
of how Matador Brass can prosecute a chapter 11 case upon a conversion to chapter 11.  Plus, its
plan does not account for the complicated and often protracted chapter 11 process.

32.     Matador Brass does not presently have authority to propose a chapter 11 plan.
Under subchapter V, only the debtor can propose a plan.  And under chapter 11 generally, the
debtor, as debtor-in-possession, has the exclusive right to propose a plan for the first 120 days
(or as a small business debtor, 180 days) after conversion.  § 1121(b), (e).[12]

33.     While Greer has a "plan" and testified at length concerning the benefits of his
plan, his testimony failed to explain how his plan could be addressed under chapter 11 generally.

34.     Matador Brass is both a creditor and a party against which the debtor asserts a
claim.  Chapter 11 affords no quick and easy path to a resolution of the issues between Matador
Brass and the debtor (or the Trustee).  Chapter 7 dictates such a path.

35.     This debtor has no funds with which to fund a plan, much less to care for and
maintain its major asset.  Matador Brass has not promised an injection of capital that would be
needed for the early months of a chapter 11 case when it would not be in possession or control of
the debtor.  The Court must be convinced that the debtor's assets are, and will be, properly
maintained—for now, the only party charged with this responsibility is the chapter 7 trustee.
Delays only serve to diminish estate assets.

---

[12] Upon request by a party in interest and for cause, the court may reduce the time period.  *See* § 1121(d).

36.    That the Court has no authority to convert a case to subchapter V of chapter 11 or to direct the debtor to elect subchapter V resolves the conversion issue in this case.

### III.   CONCLUSION

37.    The provision of the Amended Company Agreement that required Matador Brass's approval to liquidate before filing bankruptcy is void as against public policy.  Roberson was not divested of his authority as a manager upon default.  Roberson Cartridge's filing was properly authorized.

38.    The Court has no authority to convert this case to subchapter V of chapter 11. Even were conversion to chapter 11 (and not subchapter V) proposed, the Court concludes that chapter 11 is fraught with issues.  The Court is skeptical that Matador Brass's plan can be successfully and economically prosecuted in chapter 11.  The Court cannot, and will not, attempt to discern the possible "fixes" for conversion.

39.    Chapter 7 offers the best, most efficient administration of this case.  It allows all rights of the creditors and the debtor to be fully vetted, if needed.

40.    The Trustee is charged with administering the assets of the estate.  Matador Brass can pursue its rights as a creditor and is free to explore a new business venture outside the bankruptcy proceeding.

41.    The Court will issue its order denying Matador Brass's motion to convert or dismiss.  It will also issue its order rescinding the stay issued by its order of January 13, 2023 on the Trustee's proposed auction of the realty.

42.    The issues here raise mixed questions of fact and law.  Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

### End of Findings of Fact and Conclusions of Law ###